1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10
11

SUREN MANOUKYAN, an individual,

Case No. 5:26-cv-00524-SPG-AJR

Plaintiff,

12

**ORDER GRANTING, IN PART, MOTION FOR A TEMPORARY RESTRAINING ORDER [ECF NO. 3]**

13

v.

14
15
16
17
18
19
20

TODD LYONS, Acting Director, Immigration and Customs Enforcement; FERETI SEMAIA, Warden, Adelanto West ICE Processing Center; KRISTI NOEM, Secretary, U.S. Department of Homeland Security; FIELD OFFICE DIRECTOR, ICE Enforcement and Removal Operations, Los Angeles; and DOES 1-10, in their official capacities,

21

Defendants.

22

    Before the Court is the Emergency Motion for Temporary Restraining Order and

23

Stay of Removal Pending Adjudication of Petition for Writ of Habeas Corpus, (ECF No. 3

24

("Motion")), filed by Petitioner Suren Manoukyan ("Petitioner"). The Court has read and

25

considered the Motion and concluded that it is suitable for decision without oral argument.

26

*See* Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. Having considered the parties' submissions,

27

the relevant law, and the record in this case, the Court GRANTS, in part, the Motion.

28

## I.    INTRODUCTION

Petitioner is an Armenian national detained at the Immigration and Customs Enforcement ("ICE") Processing Center in Adelanto, California.   *See* (ECF No. 7 ("Petition") ¶¶ 1, 18).  In 2011, Petitioner was detained by ICE and, in March 2011, an immigration judge ("IJ") entered a final order of removal against Petitioner. *See* (*id.* ¶¶ 22–23).  In June 2011, ICE released Petitioner under an order of supervision ("OSUP").  *See* (ECF No. 10-1, Declaration of Lourdes Palacios ("Palacios Decl."), ¶ 10).   Thereafter, Petitioner remained free from custody for roughly 15 years. *See* (Petition ¶ 25).  In January 2026, at a routine check-in, ICE revoked the OSUP and took Petitioner into custody.  *See* (*id.*).

Petitioner has filed the instant Motion, challenging his continued detention under 8 U.S.C. § 1231(a)(6), as interpreted by *Zadvydas v. Davis*, 533 U.S. 678 (2001).  *See* (Motion at 3).  Petitioner claims that he has been detained for a cumulative period in excess of six months, inclusive of his detention in 2011, and there is no significant likelihood of removal in the reasonably foreseeable future.  *See* (*id.*); *see also* (Petition ¶ 35).  In the Petition, he also claims that his continued detention violates the Fifth Amendment's Due Process Clause because, among other reasons, ICE failed to provide him with "a neutral, individualized custody determination upon re-detention." (Petition ¶ 57).

In Opposition, Respondents Todd Lyons, Acting Director, ICE; Fereti Semaia, Warden, Adelanto Processing Center; Kristi Noem, Secretary, Department of Homeland Security ("DHS"); and David Marin, Field Office Director for Enforcement and Removal Operations, ICE ("Respondents") argue that Petitioner is not likely to succeed on the merits.  *See* (ECF No. 10 ("Opposition") at 3–9).  Respondents argue that Petitioner is unlikely to succeed on his claim under § 1231(a)(6) because there is a significant likelihood that Petitioner will be removed in the reasonably foreseeable future.  *See* (*id.* at 8). However, Respondents do not explain why Petitioner's removal is likely, given Armenia's prior refusal to issue travel documents to Petitioner. *See* (*id.*).  Thus, as explained below, the Court concludes that Petitioner is likely to succeed on the merits of his claim under

1   § 1231(a)(6).  The Court also finds Petitioner faces a likelihood of irreparable harm, and
2   the balance of the equities and public interest weigh in favor of granting injunctive relief.

3   **II.    FACTUAL BACKGROUND**

4          Petition is an Armenian national.  *See* (Petition ¶ 8).  He was born in Yerevan,
5   Armenia, (*id.* ¶ 18), when Armenia was part of the Union of Soviet Socialist Republics,
6   (Palacios Decl. ¶ 4).  On August 1, 2000, Petitioner was granted political asylum in the
7   United States.  *See* (Petition ¶ 19).  On or about February 12, 2002, Petitioner filed an
8   application for adjustment of status to become a lawful permanent resident but, on or about
9   June 12, 2006, his application for adjustment of status was denied.  *See* (*id.* ¶¶ 19–20).  As
10  a result, Petitioner remained admitted to the United States on asylum.  *See* (*id.* ¶ 20).

11         On June 29, 2009, Petitioner was convicted on a criminal charge of conspiracy to
12  commit kidnapping, in violation of California Penal Code § 182(a)(1) and California Penal
13  Code § 207(a).  *See* (Petition ¶ 21).  Petitioner was sentenced to eight years in prison but
14  was released from criminal custody in 2011.  *See* (*id.* ¶¶ 21–22).  Immediately upon
15  Petitioner's release from criminal custody, he was detained by ICE.  *See* (*id.* ¶ 22).  On
16  February 10, 2011, ICE issued a Notice to Appear on Petitioner.  *See* (Palacios Decl. ¶ 6).
17  On March 21, 2011, an IJ ordered Petitioner removed to Armenia.  *See* (*id.* ¶ 7).  Shortly
18  thereafter, on March 28, 2011, the Government requested travel documents from the
19  Consulate of Armenia to effectuate Petitioner's removal.  *See* (*id.* ¶ 8).  However, on or
20  around May 5, 2011, the Consulate of Armenia denied the request on the basis that it could
21  not confirm Petitioner's status as an Armenian citizen.  *See* (*id.* ¶ 9).  In a letter to DHS,
22  the Consulate General of the Republic of Armenia wrote that "the relevant Armenian
23  Authorities conducted a thorough check of the national data registries" to ascertain
24  Petitioner's citizenship but "[n]o record/evidence has been found to prove [his]
25  citizenship."  *See* (ECF No. 11 ("Reply"), Ex. A, at 15).

26         Thereafter, on May 31, 2011, a Deportation Officer emailed a DHS official in
27  Washington, D.C. to report on Petitioner's removal.  *See* (*id.* at 16).  In that email, the
28  Deportation Officer noted that the Armenian Consulate "ha[d] issued a denial letter" and

requested advice on "whether there is anything further that realistically can be done" to
effectuate Petitioner's removal. *See* (*id.*). In response, on June 7, 2011, a DHS official
replied that "Armenia is very difficult to obtain TD's" and, "[i]f they issued a denial then
there is no other option." (*Id.*). The official further noted that travel documents were "not
likely" because, even if Petitioner "could register for citizenship," Armenia would likely
refuse to issue travel documents "due to any criminal history in the U.S. or Armenia." (*Id.*).
On June 23, 2011, the Government released Petitioner on the OSUP. *See* (Palacios Decl.
¶ 10).

Petitioner remained free from custody for roughly 15 years. *See* (Petition ¶ 25). In
the Petition, he claims that, throughout this period, he fully complied with "all ICE
reporting requirements and parole requirements" and never "missed an appointment or
check-in." (*Id.*). Respondents contest this assertion. *See* (Palacios Decl. ¶¶ 11–13). In a
sworn declaration, Lourdes Palacios, a DHS Deportation Officer, claims that Petitioner
failed to report as required on June 4, 2024; his next appointment was scheduled for January
9, 2025; and he failed to report for the January 9, 2025, appointment as well. *See* (Palacios
Decl. ¶¶ 11–13). On January 20, 2026, Petitioner reported to ICE and, after conducting a
"case review," ICE took Petitioner into custody. *See* (*id.* ¶ 14); *see also* (Petition ¶ 25).
Petitioner claims that ICE failed to conduct "any meaningful individualized custody
determination" before detaining him. *See* (Petition ¶ 25).

Petitioner also contests Respondents' assertion that he missed scheduled reporting
appointments. His counsel has submitted a sworn declaration, *see* (Reply, Declaration of
Sarah Hacobian, at 11–13 ("Hacobian Decl.")), in which she attests that "Petitioner
informed [her] that he consistently complied with all ICE reporting requirements following
his release" from custody in 2011, and "at each reporting appointment, ICE officers signed
documentation confirming his attendance," (*id.* ¶ 2). According to Petitioner, "he
maintained [] a packet" with documents that confirmed his attendance at each reporting
appointment but, when ICE arrested him in January, officers seized the documents. (*Id.*
¶ 3). Through counsel, Petitioner claims that he has "repeatedly asked ICE officers to

retrieve his reporting documentation from the detaining officer, but those records have not been provided to him." (*Id.* ¶ 5).

The day after ICE re-detained Petitioner, on January 21, 2026, the Government contacted the Consulate of Armenia to facilitate Petitioner's removal. *See* (Palacios Decl. ¶ 15). However, according to the Palacios Declaration, on February 3, 2026, Petitioner refused to participate in an attempted "travel interview." (*Id.* ¶ 16). Petitioner contests this assertion. *See* (Reply at 6–7). In the Hacobian Declaration, Petitioner's counsel attests that Petitioner told her "that during his current detention ICE officers presented him with documents related to travel processing" and, in response, Petitioner "requested an opportunity to consult with counsel before signing because he did not understand the documents." (Hacobian Decl. ¶ 8). Counsel to Petitioner avers that she "subsequently advised Petitioner to cooperate fully, but, to [her] knowledge, ICE has not returned to obtain [Petitioner's] signature or provide clarification." (*Id.*).

On February 5, 2026, Petitioner filed the instant Motion. In the Petition, he claims that he has been in immigration detention for a cumulative period of more than six months, inclusive of the period of time during which he was detained by immigration officials in 2011. *See* (Petition ¶¶ 40–46). Respondents filed a brief in opposition to the Motion on February 13, 2026. *See* (Opp.). In the Palacios Declaration, submitted in connection with Respondents' Opposition, Ms. Palacios attests that the Government sent a travel document request to the Consulate General of Armenia on February 9, 2026, (Palacios Decl. ¶ 18), and, as of February 13, 2026, that request was still outstanding, (*id.* ¶ 19). On February 16, 2026, Petitioner filed a brief in reply. *See* (Reply).

## III.    LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The standard for issuing a temporary restraining order is essentially the same as that for issuing a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) ("[T]he legal standards applicable to TROs

and preliminary injunctions are substantially identical." (internal quotation marks and citation omitted)).  A plaintiff may secure a temporary restraining order upon establishing that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest.  *See Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter*, 555 U.S. at 20).

"[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted).  "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'"  *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The court is permitted to consider the parties' pleadings, declarations, affidavits, and exhibits submitted when deciding an application for a temporary restraining order.  *See Earth Island Inst. v. Nash*, No. 1:19-cv-01420-DAD-SAB, 2020 WL 1936701, at *6 (E.D. Cal. Apr. 21, 2020) ("[I]n considering a motion for preliminary injunction, a court may consider and rely upon declarations, affidavits, and exhibits submitted by the parties." (citations omitted)); *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1119–20 (S.D. Cal. 2004) (considering declarations submitted by defendants to deny plaintiff's request for a preliminary injunction).  "The trial court may give even inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm before trial." *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).  The urgency of

the relief sought necessitates a prompt determination and can make it difficult to obtain admissible evidence.  *See id.*

## IV.    DISCUSSION

In the Motion, Petitioner argues that his continued detention is unreasonable because there is no significant likelihood that the Government will be able to remove him in the reasonably foreseeable future.  *See* (Motion at 2–3).  He requests interim injunctive relief in the form of an order staying his removal from the United States, requiring Respondents to file an expedited response to the Petition, and prohibiting his transfer outside the Central District of California.  *See* (ECF No. 8-1 at 2–3).  As discussed below, Petitioner has raised a serious question going to the merits whether his continued detention violates § 1231(a)(6), as interpreted by *Zadvydas*; he faces irreparable harm from the prospect that the Government will relocate him to custodial facilities outside the Court's jurisdiction; and the balance of the equities weighs in his favor.  However, Petitioner has not shown that he is entitled to a stay of removal, as he requests.

### A.    Likelihood of Success on the Merits

In both the Motion and Petition, Petitioner argues that his continued detention is unlawful under 8 U.S.C. § 1231(a)(6), as interpreted by *Zadvydas*, because his removal is not likely in the reasonably foreseeable future.  *See* (Petitioner ¶¶ 35, 39–52; Motion at 3). Specifically, in the Motion, Petitioner argues that his removal is not likely in the reasonably foreseeable future because (a) he has been subject to an order of removal for approximately 15 years; (b) he was previously released from ICE detention because the Government was unable to deport him; and (c) the Government has repeatedly failed to remove him.  *See* (Motion at 3).  Respondents do not contest these assertions.  *See generally* (Opp.).  Instead, Respondents merely argue that "[t]he *Zadvydas* standard for proving entitlement to release is high," and "Petitioner does not attempt to make such a *Zadvydas* showing."  (Opp. at 4).[1]  The Court disagrees that such a high showing has not been made.

---

[1] Although Respondents claim that Petitioner failed to check-in with ICE on two occasions, Respondents do not defend Petitioner's re-detention on this basis.  *See Ghasedi v. Wamsley*,

A noncitizen ordered removed must be removed "from the United States within a period of 90 days." 8 U.S.C. § 1231(a)(1)(A).  The government is required to detain the noncitizen for this initial 90-day period for the purpose of effectuating removal.  *See* 8 U.S.C. § 1231(a)(2)(A).  If removal is not effectuated during this period, "the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3). However, under 8 U.S.C. § 1231(a)(6), certain "[i]nadmissible or criminal aliens" subject to an order of removal "may be detained beyond the removal period." *See* 8 U.S.C. § 1231(a)(6).

In *Zadvydas*, the Supreme Court "read an implicit limitation" into § 1231(a)(6) to prevent the Government from indefinitely detaining aliens subject to an order of removal. *See* 533 U.S. at 689.  The Court explained that an interpretation of § 1231(a)(6) that permitted indefinite immigration detention would "raise a serious constitutional problem" under the Fifth Amendment's Due Process Clause.  *Id.* at 690.  In assessing a constitutionally reasonable period for detention, the Court instructed that the judiciary must "grant the Government appropriate leeway" in light of the foreign policy considerations attendant in immigration enforcement and the Executive Branch's immigration-related expertise. *See id.* at 700.  Therefore, the Court concluded that it was "practically necessary" to recognize that the Government may "presumptively" detain an alien subject to removal for a six-month period. *See id.* at 701.

Here, Petitioner claims that he has been detained for an aggregate period in excess of six months.  *See* (Petition ¶ 46).  In Opposition, Respondents do not contest this assertion.  *See generally* (Opp.).  However, based on the Palacios Declaration, it appears

No. 2:25-CV-01984-RSM-BAT, 2025 WL 3699705, at *6 (W.D. Wash. Dec. 1, 2025) (noting fact dispute about compliance with order of supervision but rejecting relevance to *Zadvydas* analysis where the government did not argue alien was re-detained based on a violation of a specific condition of release and the record did not show any ICE official made a finding of non-compliance); *see also Martinez v. Chestnut*, No. 1:25-CV-1826 TLN CKD P, 2026 WL 121221, at *4 (E.D. Cal. Jan. 16, 2026) ("Even if petitioner failed to properly check in with ICE officials on two occasions as suggested, such violations of terms of release warrant a pre-detention hearing rather than automatic detention.").

that, following the order of removal, Petitioner has been detained for an aggregate period of approximately four months. *See* (Palacios Decl. ¶¶ 7, 10 (Petitioner was ordered removed on March 21, 2011, and released from custody on June 23, 2011)); *see also* (*id.* ¶¶ 14, 20 (Petitioner was re-detained on January 20, 2026)). Thus, as it appears Petitioner has been detained for less than six months, Petitioner's detention is "presumptively reasonable" under *Zadvydas*.

Nevertheless, the six-month presumption set forth in *Zadvydas* is "just that—a presumption." *Clark v. Martinez*, 543 U.S. 371, 387 (2005) (O'Connor, J., concurring). "Such a presumption is not a prohibition on claims challenging detention less than six months." *Burunsuzyan v. Noem*, No. 5:26-CV-00049-RGK-AGR, 2026 WL 246067, at *5 (C.D. Cal. Jan. 27, 2026) (internal quotation marks omitted); *see also Ndandu v. Noem*, No. 3:25-CV-02939-RBM-MSB, 2026 WL 25848, at *3 (S.D. Cal. Jan. 5, 2026) (collecting cases for the proposition that the six-month presumption is rebuttable). As *Zadvydas* made clear, courts assessing a challenge to detention under § 1231(a)(6) "must ask whether the detention in question exceeds a period reasonably necessary to secure removal" and, "if removal is not reasonably foreseeable, the court should hold continued detention unreasonable and no longer authorized by statute." *Zadvydas*, 533 U.S. at 699–700.

Here, Petitioner has sufficiently rebutted the presumption that his continued detention pursuant to § 1231(a)(6) is reasonable. An IJ ordered Petitioner's removal to Armenia in March 2011. *See* (Palacios Decl. ¶ 7). Petitioner remained in immigration detention for roughly three months thereafter, as the Government attempted to effectuate Petitioner's removal. *See* (*id.* ¶¶ 7–10). However, in May 2011, Armenia informed the Government that it would not issue a travel document to Petitioner, as Petitioner's "citizenship could not be confirmed." *See* (*id.* ¶ 9). The Government kept Petitioner in immigration detention for roughly another month and a half. *See* (*id.* ¶¶ 9–10). During this period, the Government explored "whether there [was] anything further that realistically [could] be done" to effectuate Petitioner's removal but ultimately determined

1   that it was "not likely" that Armenia would issue travel documents for Petitioner.  *See*

2   (Reply, Ex. A, at 16).  As a result, in June 2011, the Government released Petitioner from

3   immigration detention.  *See* (Palacios Decl. ¶ 10).  Petitioner remained free from custody

4   until he was re-detained in January 2026.  *See* (*id.* ¶ 14).

5          At a minimum, the Government's inability to remove Petitioner to Armenia between

6   2011 and 2026 poses a serious question going to the merits, sufficient to support

7   Petitioner's request for preliminary injunctive relief.  *See Cottrell*, 632 F.3d at 1135.[2]

8   Although Respondents claim that "[t]here is no bar against Petitioner's removal to his home

9   country of Armenia," (Opp. at 8), Armenia has previously denied Petitioner travel

10  documents on the basis that it was unable to confirm his citizenship, *see* (Palacios Decl.

11  ¶ 9).  Further, as of 2011, the Government determined that, even if Armenia confirmed his

12  citizenship, Armenia is unlikely to issue travel documents to Petitioner, in light of his

13  criminal record.  *See* (Reply, Ex. A, at 16).    Thus, notwithstanding Respondents'

14  conclusory assertion that "there is a significant likelihood that Petitioner will be removed

15

16  [2] In *Lema v. INS*, the Ninth Circuit held that "when an alien refuses to cooperate fully and
    honestly with officials to secure travel documents from a foreign government, the alien
17  cannot meet his or her burden to show there is no significant likelihood of removal in the
    reasonably foreseeable future."  341 F.3d 853, 856 (9th Cir. 2003).  The Palacios
18  Declaration asserts, without elaborating, that, "[o]n February 3, 2026, a travel interview
19  was attempted but [Petitioner] refused to participate." (Palacios Decl. ¶ 16).  Petitioner
    contests this assertion, stating that he "did not refuse to sign any document" but rather
20  "informed ICE officers that he did not understand the document presented to him and
    wished to consult with counsel before signing." (Reply at 6).  Regardless, based on the
21  limited record presented on the Motion, this does not appear to be a case in which "the
22  alien has the keys to freedom in his pocket and could likely effectuate his removal by
    providing the information requested by the INS." *Lema*, 341 F.3d at 856 (internal quotation
23  marks and alterations omitted).    Here, Armenia has already refused to issue travel
24  documents to Petitioner, and Respondents do not contend that Petitioner refused to
    cooperate with the Government's attempts to effectuate his removal in 2011. *See* (Palacios
25  Decl. ¶¶ 8–9).  In concluding that the Government is not reasonably likely to remove
26  Petitioner in the foreseeable future, the Court relies on the Government's seeming inability
27  to remove Petitioner over the course of an approximately 15-year period.

28

in the reasonably foreseeable future," (Opp. at 8), Petitioner has submitted compelling evidence to the contrary.

### B.   Irreparable Harm

Petitioner has sufficiently shown that he faces irreparable harm, absent injunctive relief to prevent the Government from relocating him to outside the Central District of California. "The irreparable harms imposed on anyone subject to immigration detention (or other forms of imprisonment) are self-evident." *Guillermo M. R. v. Kaiser*, 791 F. Supp. 3d 1021, 1037 (N.D. Cal. 2025) (internal quotation marks, alterations, and citation omitted); *see also Padilla v. Bowen*, No. 2:25-CV-10780-CAS-SK, 2025 WL 3251368, at *9 (C.D. Cal. Nov. 21, 2025) ("The Ninth Circuit has recognized 'the irreparable harms imposed on anyone subject to immigration detention'" (quoting *Hernandez v. Sessions*, 872 F.3d 976, 995 (9th Cir. 2017)). Further, beyond depriving him of his liberty, Petitioner contends that his "sudden and unanticipated re-detention has imposed severe and immediate hardship on his family, including the loss of their principal source of financial support, disruption of childcare and family stability." (Petition ¶ 29); *see also Barker v. Wingo*, 407 U.S. 514, 532–33 (1972) (incarceration "has a detrimental impact on [an] individual" because "it often means loss of a job" and "disrupts family life."). So long as the Government keeps Petitioner in custody, interim injunctive relief to prevent the Government from relocating Petitioner outside the Central District of California is warranted to preserve the Court's jurisdiction. *See California Energy Com'n v. Johnson*, 767 F.2d 631, 634 (9th Cir. 1985) ("The All Writs Act, 28 U.S.C. § 1651(a), empowers the federal courts to issue writs of mandamus necessary to protect their prospective jurisdiction.").

However, Petitioner has not shown a likelihood of irreparable harm insofar as he seeks a stay of removal. Petitioner's request for a stay of removal runs directly counter to his argument in the Motion and Petition that his removal in the reasonably foreseeable future is unlikely. Further, Petitioner has not sufficiently established that he would face irreparable harm if removed to Armenia, as he does not challenge the order of removal.

### C.    Balance of Equities and Public Interest

When the government is the nonmoving party on a TRO application, the Court's consideration of the balance of the equities and public interest merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). However, while there is a "public interest in prompt execution of removal orders," *Nken*, 556 U.S. at 436, any effort to move Petitioner to custodial facilities outside the Central District of California is unlikely to serve this interest. Therefore, the Court finds that the Motion poses "[s]erious questions going to the merits and a balance of hardships that tips sharply towards the [Petitioner]." *Cottrell*, 632 F.3d at 1135 (internal quotation marks omitted).

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS the Motion, in part, and ORDERS as follows:

1.    Respondents are ORDERED not to transfer Petitioner outside the Central District of California, except insofar as Respondents are able to remove Petitioner to Armenia, in accordance with the order of removal.

2.    Respondents are ORDERED TO SHOW CAUSE why a preliminary injunction should not issue at an in-person hearing on Wednesday, March 4, 2026, at 9:00 a.m. in Courtroom 5C. Petitioner shall file an opening brief and related submissions no later than Monday, February 23, 2026, at 5:00 p.m. Respondents shall file an opposition no later than Friday, February 27, 2026, at 5:00 p.m.

3.    The parties may file and the Court will consider a stipulation requesting an extension of the briefing schedule so long as the parties also agree to an extension of the TRO.

4.    Because Petitioner has not shown that he is likely to suffer irreparable harm absent an order to enjoin his removal, Petitioner's request for an order prohibiting Respondents from removing Petitioner from the United States, listed as no. 1 in Petitioner's "Requested Relief," is DENIED.

4.    The Petition and Motion to Expedite Consideration of Petition for Writ of Habeas Corpus, (ECF No. 2), are both referred to the assigned Magistrate Judge for further adjudication.  The parties are directed to follow the orders of the Magistrate Judge regarding briefing and further habeas proceedings.

5.    Because Petitioner has already filed the above motion for expedited briefing on the underlying Petition, which remains pending, (ECF No. 2), Petitioner's duplicative request in the Motion for expedited briefing, listed as no. 3 in Petitioner's "Requested Relief," is DENIED.

**IT IS SO ORDERED.**

DATED:  February 18, 2026

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE